**ORIGINAL**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

MAY 25 2010

CLERK, U.S. DISTRICT COURT
By_____
            Deputy

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

VICKI CHADWELL,          §
    PLAINTIFF,          §
                §
v.          §   CIVIL ACTION NO. 4:08-CV-736-Y
                §
MICHAEL J. ASTRUE,          §
COMMISSIONER OF SOCIAL SECURITY,          §
    DEFENDANT.          §

## FINDINGS, CONCLUSIONS AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE
## AND
## NOTICE AND ORDER

This case was referred to the United States Magistrate Judge pursuant to the provisions of

Title 28, United States Code, Section 636(b).  The Findings, Conclusions and Recommendation

of the United States Magistrate Judge are as follows:

## I. FINDINGS AND CONCLUSIONS

A.    Statement of the Case

Plaintiff Vicki Chadwell filed this action pursuant to Sections 405(g) and 1383(c)(3) of

Title 42 of the United States Code for judicial review of a final decision of the Commissioner of

Social Security denying her claims for disability insurance benefits under Title II of the Social

Security Act ("SSA").  On April 8, 2005, Chadwell applied for disability insurance benefits

alleging that she became disabled on November 13, 2004.  (Transcript ("Tr.") 14, 135-41, 188.)[1]

---

[1]Chadwell apparently later filed another application for disability ("second application").  The SSA, in a letter dated June 2, 2009, found that she was disabled as of May 13, 2008.   (Pl.'s Br. at Attach. 1.)  Because Chadwell has presented no evidence that the second application sought benefits for the same time period or deals with the same medical evidence as the current disability application before the Court, such award of disability is

Her applications were denied initially and on reconsideration. (Tr. 14, 120-24, 130-34.) The Administrative Law Judge ("ALJ") held a hearing on April 9, 2008 and issued a decision on May 12, 2008 that Chadwell was not disabled because she was capable of performing her past relevant work as a medical billing clerk, accounts payable clerk, recovery clerk, and senior billing clerk. (Tr. 10-25; *see* Tr. 175, 712-17.) Chadwell filed a written request for review, and the Appeals Council denied Chadwell's request for review, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 4-9.)

B.      Standard of Review

Disability insurance is governed by Title II, 42 U.S.C. § 404 *et seq.* of the SSA. In addition, numerous regulatory provisions govern disability insurance benefits. *See* 20 C.F.R. Pt. 404. The SSA defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. §§ 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520 (2009). First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. § 404.1527. Second, the claimant must have an impairment or combination of impairments that is severe. 20 C.F.R. § 404.1520(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). Third, disability will be

---

irrelevant to this case. *See Fisher v. Astrue*, No. 08-3630, 2009 WL 3672865, at *2 (E.D. La. Oct. 28, 2009) (remanding case pursuant to sentence six of 42 U.S.C. § 405(g) to resolve inconsistencies between an earlier unfavorable decision and subsequent favorable one where the two inconsistent disability determinations covered nearly the same time period and were largely based on the same evidence).

found if the impairment or combination of impairments meets or equals an impairment listed in the Listing of Impairments ("Listing"), 20 C.F.R. Pt. 404, Subpt. P, App. 1.  20 C.F.R. § 404.1520(d).  Fourth, if disability cannot be found on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work.  20 C.F.R. § 404.1520(e).  And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience.  20 C.F.R. § 404.1520(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).  At steps one through four, the burden of proof rests upon the claimant to show he is disabled.  *Crowley,* 197 F.3d at 198.  If the claimant satisfies this responsibility, the burden shifts to the Commissioner to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments.  *Id.*

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole.  *Leggett v. Chater,* 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen,* 837 F.2d 1378, 1382 (5th Cir. 1988).  Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion.  *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir. 2001).  It is more than a mere scintilla, but less than a preponderance.  *Id.*  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision.  *Id.*  This Court may neither reweigh the evidence in the record nor substitute its judgment for the Commissioner's, but will carefully scrutinize the record to determine if the evidence is present.  *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir. 2000); *Hollis,* 837 F.2d at 1383.

C.    Issue

Whether the ALJ erred by failing to incorporate all of the functional limitations imposed by Chadwell's mental impairments into the Residual Functional Capacity ("RFC") assessment.

D.    Administrative Record

1.  Relevant Treatment History[2]

On May 3, 2005, Chadwell reported in a "Disability Report—Adult" Form that she had trouble remembering things and that she felt depressed because she could not remember or do the activities that she once enjoyed doing.  (Tr. 174; *see* Tr. 173-87.)  Three days later, in a "Function Report—Adult" Form, Chadwell stated that she did not like attending social activities because she had trouble "with conversations and comprehension."  (Tr. 170; *see* Tr. 165-70.) She also indicated that she did not handle stress well.  (Tr. 171.)  In a "Disability Report— Appeal" Form, dated August 1, 2005, Chadwell reported that she was having more problems with her memory and conversing with others.  (Tr. 158-64.)

Throughout 2004 and 2005 Jennifer Larson, M.D., treated Chadwell for a variety of ailments, including depression.  (Tr. 250-62, 428, 433-46, 448-50.)  Larson prescribed Chadwell with various medications in an attempt to treat her depression and noted that Chadwell "hardly smiles but makes good eye contact."  (Tr. 252, 254, 256, 428.)  In a letter dated May 17, 2005 to the "Social Security Claims Disability Determination Service," Larson opined, "The patient has no limitations in understanding or remembering instructinos [sic] or maintaining attention.  She would be able to interact with supervisors and co-workers and the public."  (Tr. 447.)

---

[2] Because Chadwell's arguments relate solely to the functional limitations caused by her mental impairments, the Court will review only the medical evidence relating to Chadwell's mental impairments.

In a Psychiatric Review Technique Form ("PRTF") dated July 8, 2005, Thomas Tsai, a State Agency psychiatrist, indicated that Chadwell suffered from a depressive syndrome, characterized by sleep disturbance, decreased energy, and difficulty concentrating.   Tsai's complete assessment reflects findings that Chadwell's mental impairment did not meet the criteria of paragraphs A, B, or C of Section 12.04.[3]   (Tr. 273; *see* Tr. 270-83.)   He indicated that

---

[3]Listing 12.04, as relevant here, addresses affective or mood disorders:

12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial . . . depressive syndrome. . . .
     The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
. . . .
  A. Medically documented persistence, either continuous or intermittent, of one of the following:
. . . .
    1.    Depressive syndrome characterized by at least four of the following:
        a.  Anhedonia or pervasive loss of interest in almost all activities; or
        b.  Appetite disturbance with change in weight; or
        c.  Sleep disturbance; or
        d.  Psychomotor agitation or retardation; or
        e.  Decreased energy; or
        f.  Feelings of guilt or worthlessness; or
        g.  Difficulty concentrating or thinking; or
        h.  Thoughts of suicide; or
        i.  Hallucinations, delusions, or paranoid thinking; . . . .
AND
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration;
OR
C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
    1. Repeated episodes of decompensation, each of extended duration; or
    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement.

20 C.F.R. Part 404, Subpart P, app. 1, § 12.04.

Chadwell suffered from a major depressive disorder that did not precisely satisfy the diagnostic criteria of Section 12.04 of the Listing. (Tr. 273.) Tsai opined that Chadwell was mildly limited in her activities of daily living and moderately limited in maintaining social functioning and concentration, persistence, or pace. (Tr. 280.) In a Mental Residual Functional Capacity Assessment ("MRFC") dated the same day, Tsai stated that Chadwell, due to her major depressive disorder, could perform unskilled work and was moderately limited in her ability to understand, remember, and carry out detailed instructions, maintain attention and concentration for extended periods, and accept instructions and respond appropriately to criticism from supervisors. (Tr. 284-86.)

On June 14, 2005, Marianne Georgen, Psy.D., evaluated Chadwell for a variety of complaints, including depression. (Tr. 288-91.) Chadwell reported that she had lost interested in doing social things, was forgetful, and felt tired most of the day. (Tr. 288.) Georgen diagnosed Chadwell with a variety of ailments, including "Major Depressive Disorder, recurrent, moderate" and rated her GAF score[4] at a 50.[5] (Tr. 291.)

In a Daily Activity Questionnaire dated March 24, 2006, Chadwell stated that her depression limited her ability to remember simple things, make decisions, concentrate, and communicate with others. (Tr. 153-57; *see also* Tr. 150-52.) She also reported that she had trouble controlling her anger, had little patience, and had suicidal thoughts. (Tr. 153-57.) In

---

[4]A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994) (DSM-IV).

[5]A GAF score of 41 to 50 reflects serious symptoms or any serious impairment in social, occupational, or school functioning. DSM-IV at 34.

addition, she stated that she had attempted to take antidepressants to help with her depression but that they caused her to be sleepy, groggy, or kept her awake at night. (Tr. 153.) She reported that in an average day she would get up, sometimes eat breakfast, occasionally go to the store, clean around the house, check the mail, watch television, and sometimes cook dinner. (Tr. 154.) She stated that she had difficulty performing routine tasks and that her husband helped her pay the bills and perform household chores. (Tr. 154-55.) She further reported that she did not feel like going to public places anymore and became nervous or scared when she had to meet new people. (Tr. 156.)

On May 2, 2006, Darrell Horton, Ph.D., examined Chadwell as to, *inter alia*, her depression. He noted that Chadwell reported that she used to be socially active but that she no longer wanted to be around people because she was "self conscious about her tremors and her forgetfulness." (Tr. 227.) Horton diagnosed Chadwell with "Depressive Disorder NOS" and noted that her current GAF score was a 50. (Tr. 229.) He further stated, "Vicki's prognosis is poor. Even with intervention for her depression, her physical condition does not seem to be improving. This had a great affect on her mood." (Tr. 229.)

A Disability Determination and Transmittal ("DDT") Form, dated June 12, 2006 and signed by Terry Collier, M.D., indicated that Chadwell was diagnosed with, *inter alia*, "depressive disorder not otherwise specified" and was not disabled. (Tr. 61.) In a MRFC dated June 12, 2006, Mehdi Sharifian, M.D., opined that Chadwell was moderately limited in her ability to do the following: (1) understand, remember and carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or proximity to others without being distracted by them; (4) complete a normal work-day and

workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) accept instructions and respond appropriately to criticism from supervisors; and (6) respond appropriately to changes in the work setting. (Tr. 208-09.) She further stated that Chadwell "retains the ability to understand, remember, and follow detailed but not complex instructions; to interact with others appropriately; to adapt to routine change in the work place." (Tr. 210.) In a PRTF, Sharifian stated that Chadwell had an affective disorder of "depressive d/o nos" and that such disorder did not precisely satisfy the diagnostic criteria of section 12.04 of the Listing. (Tr. 215.) She further stated that Chadwell had moderate difficulties in maintaining social functioning, concentration, persistence, or pace. (Tr. 222.)

Stasha Gominak, M.D., of the East Texas Medical Center Neurological Institute treated Chadwell from 2006 through 2008. (Tr. 507-16, 662-73; *see* Tr. 573-84.) In a "Neurology Followup" report dated March 20, 2007, Gominak opined:

> Ms. Chadwell is a 45-year-old with multiple complaints. Her original complaints on seeing me were tremor, balance difficulty, memory problems, sleepiness, daily headache, depression, restless legs syndrome, etc. . . . As in her first visit with me, I think her balance complaint is feigned and I think her tremor is feigned as well. She does not actually have an action tremor or a rest tremor. When she points out the tremor to me, she starts shaking her hands voluntarily. Her difficulty with her gait is also feigned. She is actually able to do tandem. She is able to do heel-knee-shin. She needs a lot of encouragement. But basically is [sic] appears that she is not trying very hard, and I do not find anything on her examination that would suggest she actually has any sort of extrapyramidal disorder, memory disorder, cerebellar disorder, etc. My original comment on Ms. Chadwell was that I did not think she was very motivated to get better. I get the feeling that she wants to go out on disability, and she still does not seem very hopeful about anything in her medical care, even though we have clearly made a lot of her complaints better.

(Tr. 507; *see* Tr. 573.) In a "Neurology Followup" report dated March 19, 2008, Gominak

further stated:

> [Chadwell] turns out to have obstructive sleep apnea as well as restless
> legs syndrome and depression. It took me a long time to figure out that she really
> did not have only an exaggerated tremor but a real underlying pill-rolling tremor
> and she was becoming more and more obviously parkinsonian, so I think she
> really does make the diagnosis of early onset Parkinson's disease. . . . She has
> less pain complaints. She has lost about 40 pounds. She seems less depressed.
> Generally I think she is doing better.

(Tr. 662.)

Chadwell was treated on an out-patient basis at the Andrews Center from 2007 to 2008

regarding issues relating to depression. (Tr. 67-78; 625-61, 696-99.) Her GAF score was rated

at 45 in October 2007 and 42 in March 2008. (Tr. 633, 639.) She complained several times

during her treatment that she was having suicidal thoughts. (*See, e.g.*, Tr. 633-34, 636, 640,

649.) She also stated that she was depressed that her mother was dying and that two of her aunts

had recently died. (*See, e.g.*, Tr. 634, 636.) She further reported that her husband was not

supportive and the she had been drinking some alcohol. (*See, e.g.*, Tr. 634, 636-37.)

Horton evaluated Chadwell in January 2008 for memory problems by giving her the

Wechsler Memory Scale-III ("WMS-III") test. (Tr. 607.) In a letter dated February 15, 2008 to

Gominak, Horton opined:

> The Auditory Immediate memory is in the borderline range indicates [sic]
> some significant difficulty in this area. The overall Immediate Memory is in the
> lower part of the low average range also suggesting some difficulty. The Logical
> Memory subtests were quite low and suggest significant problems. These tests
> rely on auditory processing and memory.
>
> Functional limitations would include understanding and remembering
> detailed instructions, carrying out detailed instructions, and perhaps some
> difficulty in appropriate social interactions in that she may miss out on
> conversation. These results certainly have implications for how I might continue
> therapy with her as well as probably eliminating the value of any type of group

approach.

(Tr. 608.)

Horton evaluated Chadwell again on April 14, 2008 for purposes of determining her disability status. (Tr. 674-78.) After performing a clinical interview and reviewing Chadwell's medical records and the results of a WMS-III test and Personality Assessment Inventory ("PAI"),[6] Horton stated:

> Confidence in Results: Testing was completed under standardized conditions. Validity indicators suggest that there may have been some exaggeration of symptoms. Patterns of this type are relatively infrequent among bona fide clinical patients. Although this pattern does not necessarily indicate a level of distortion that would render the test results in [sic] interpretable, the interpretative hypotheses presented in this report may overrepresent the extent and degree of significant findings in certain areas.
>
> . . . .
>
> Mrs. Chadwell reports a level[] of depressive symptomatology that is unusual even in clinical samples. She is severely depressed, discouraged, and withdrawn. Cognitively, she is plagued by thoughts of failure and worthlessness to the extent of feeling hopeless about the future. She has also [lost] interest in many previously enjoyable activities and finds little sense of pleasure. Psychomotor slowing was observed. Somatic complaints have become a ruminative preoccupation for her. She reports that day functioning has been compromised by numerous physical problems. Her social interactions and conversations tend to focus on her health problems. She has a great deal of worry and tension to such as [sic] degree that it affects her ability to concentrate.
>
> . . . .

---

[6]The PAI was performed by Leslie Morey, Ph.D., on April 14, 2008. (Tr. 680-92.) Morey noted that testing indicators suggested that Chadwell "may not have answered in a completely forthright manner" and exaggerated her complaints and problems. (Tr. 685.) Morey opined that the test results showed that Chadwell was "severely depressed, discouraged, and withdrawn, and most likely meets criteria for a major depressive episode." (Tr. 686.) Morey further stated that Chadwell was "likely to be quite emotionally labile, manifesting fairly rapid and extreme mood swings and, in particular, probably experiences episodes of poorly controlled anger." (Tr. 687.) Morey also opined that Chadwell was likely to be envious of others and would not be inclined to help others in reaching their goals. (*Id.*) As to Chadwell's interpersonal and social environment, Morey stated that Chadwell was uncomfortable in social situations and did not have an interest in or need for interacting with others. (*Id.*)

Mrs. Chadwell describes herself as a socially isolated individual who has few interpersonal relationships that could be described as close and warm. She may have difficulty interpreting the normal nuances of interpersonal behavior that provide meaning to personal relationships. This fosters a sense of discomfort in interpersonal settings. She also views what social relationships she does have as offering little support.

. . . .

The configuration of clinical scales suggests a person who is reporting significant distress with particular concerns about her physical functioning. She sees her life as disrupted by a variety of physical problems which have left her unhappy, with little energy or enthusiasm for concentrating on important life tasks and little hope for improvement in the future. Compounding this are memory deficits that increase the stress she experiences. The prognosis for competitive employment is poor.

(Tr. 675-78.)

2.  Administrative Hearing

Chadwell was born on July 7, 1961, and she has a high school diploma and an Associate's degree in accounting. (Tr. 135, 650, 709.) At the April 9, 2008 hearing, Chadwell testified that she had lost weight due to her depression and that she spent her days taking her medicine, trying to cook, using the computer, working on puzzles, taking walks to the lake, and occasionally going to the grocery store. (Tr. 707, 726-27.) She stated that her depression started in September 2003 and that she had been taking antidepressants on and off since then. (Tr. 732.) She further reported that she was being treated by Horton and at the Andrews Center for her depression. (Tr. 732.) She stated that she did not like to be around people and she felt worthless. (Tr. 736-37.)

Craig Moore, Ph.D., testified at the hearing regarding Chadwell's mental impairments. (Tr. 745-49.) He stated that he had reviewed her records and noted that she was diagnosed with

11

major depressive disorder. (Tr. 745-746.) In evaluating her depression based on Section 12.04 of the Listing, Moore found that Chadwell was mildly restricted in her activities of daily living and had moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, and pace but that she did not meet or equal the specific criteria under Section 12.04 or any other section of the Listing. (Tr. 747.) As to her workplace limitations, Moore opined that Chadwell could perform detailed and simple work, could make simple work-related decisions, and should have no or limited restrictions as to working with supervisors, coworkers, or the public. (Tr. 747-48.) In clarifying his previous finding that Chadwell was moderately restricted in social functioning, Moore emphasized that the previous restriction was made based on the evaluation criteria set forth in Section 12.04 of the Listing. Specifically, Moore stated:

> I gave [the ability to work with supervisors, coworkers, or the public] a moderate under Criteria B [of Section 12.04], mostly based upon [Chadwell's] testimony here, not so much on the past history. [In terms of workplace limitations,] I do feel she's capable of multi-step processes and is capable of working even in the setting where there are changes to the work setting and I see very limited or no restrictions there.

(Tr. 748.)

### 3. ALJ Decision

The ALJ, in his May 12, 2008 decision, found that Chadwell had not engaged in any substantial gainful activity at any time since November 13, 2004, the alleged onset date. (Tr. 16.) He further found that she had the severe impairments of osteoarthritis of the right knee, fine tremors in outstretched hands, cervical and lumbar disc disease, sleep apnea, chest pain, hypertension, body mass index of 37, edema, and depression. (*Id.*) He held that none of her impairments, however, met or equaled the severity of any impairment in Listing § 12.04. (Tr. 17.) As to her depression, the ALJ stated:

12

[C]onsistent with the medical expert's testimony, I fine [sic] the claimant's depression does not meet or medically equal the criteria of Listing 12.04. In making this finding, I have considered whether the "paragraph B" criteria are satisfied. To satisfy the "paragraph B" criteria, the mental impairment must result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. . . .

Further consistent with the expert's testimony, I find the claimant has mild restriction in activities of daily living, and she has moderate difficulties in social functioning and in concentration, persistence or pace.   The claimant has experienced no episodes of decompensation . . .

Because the claimant's mental impairment does not cause at least two "marked" limitations or one "marked" limitation and "repeated" episodes of decompensation, the "paragraph B" criteria are not satisfied.   I have also considered whether the "paragraph C" criteria are satisfied.   In this case, the evidence fails to establish the presence of the "paragraph C" criteria, as the claimant lives at home with her husband and does some grocery shopping and household chores.   She drives alone several times a week and drove to the hearing.

I note here that the limitations identified in the "paragraph B" and "paragraph C" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing . . . . Accordingly, I have translated the above "B" and "C" criteria findings into work-related functions in the residual functional capacity assessment below.

(Tr. 17-18.) As to the Chadwell's RFC, the ALJ stated:

The claimant has the [RFC] to perform sedentary work . . . except that she must be able to change positions to stretch for 2-3 minutes at 30-45 minute intervals, cannot work on ropes, ladders, or scaffolds and can perform other postural functions not more than 2 hours in an 8-hour workday, cannot work at heights or with hazardous machinery or in close proximity to hazardous machinery, and cannot perform work that involves complex instructions.

(Tr. 18.)   In support of the RFC, the ALJ cited to the medical records in the record and

13

Chadwell's own reports and testimony of her impairments. (Tr. 18-24.) Specifically, the ALJ

stated:

> Recent evidence shows Dr. Gominak has continued to see the claimant for neurology follow-up. On November 16, 2006, Dr. Gominak noted that the claimant's headaches were much better, her tremors were better, and her depression, memory disorder, and body pain were about the same. The neurologist noted the claimant's chronic depression was better as she was sleeping better when seen on March 19, 2008.
>
> . . . .
>
> The claimant [was] seen at the Andrews Center in late 2007 and referred to Darrell Horton, Ph.D., for evaluation of memory problems by her neurologist Dr. Gominak. . . . Dr. Horton concluded that functional limitations would include understanding and remembering detailed instructions, carrying out detailed instructions, and perhaps some difficulty in appropriate social interactions.
>
> Clinical Psychologist medical expert Dr. Moore testified the foregoing evidence shows that the claimant would have no limitations with detailed or simple work but would be at risk with complex work. She would be capable of making simple work-related decisions and of working with supervision, co-workers, and with the public. She would have no restriction in terms of the work setting and would be capable of performing a multi-step work process.
>
> I find the medical expert's testimony persuasive in showing the claimant's depression results in a mental residual functional capacity for work that involves no complex instructions. I note the recent WMS-III evaluation shows the claimant's functional limitations would include understanding and remembering detailed instructions, carrying out detailed instructions, and perhaps some difficulty in appropriate social interactions. I also observe the claimant's primary care physician, Dr. Larson, who prescribed medication for depression, stated on May 17, 2005 that the claimant 'has no limitations in understanding or remembering instructions or maintaining attention . . . and would be able to interact with supervisors and co-workers and the public.' The claimant can meet the mental demands of work except for work that involves complex instructions.
>
> The claimant's post-hearing evidence shows further treatment at the Andrews Center where she complained of sleep problems, forgetfulness, and depression when seen on October 30, 2007. She reported stressors of her mother in the process of dying, two aunts having died in the past year, and a non-supportive husband. . . .

14

The claimant's attorney referred her to Darrell Horton, Ph.D., for a second psychological evaluation which was carried out on April 14, 2008. . . .  The Clinical Interpretive Report of the [PAI] of April 14, 2008 indicated that the clinical scales may over represent or exaggerate the actual degree of the claimant's psychopathology in a person who is reporting significant distress with particular concerns about her physical functioning. . . .

I find these recent reports from the Andrews Center and from Dr. Horton do not change the conclusion of the Clinical Psychologist medical expert Dr. Moore adduced at the hearing on April 9, 2008.  The Andrews Center reports, by a registered nurse and not from a doctor, essentially show situational depression relative to the recent illnesses and deaths of the claimant's mother and two aunts and lack of support from her husband, self admittedly worsened by alcohol abuse.  Dr. Horton's PAI report suggests exaggeration and notes alcohol dependence is little different from his earlier report. . . . Finally, I note the claimant's GAF codes in the mid-40s would suggest serious symptoms and impairments in occupational functioning.   I find, however, that such serious functional diminution is inconsistent with the claimant's educational achievement, she has two years of college credit in accounting, and her admitted activities of checking her email, watching some television, doing errands, preparing simple meals, taking care of pets, reading the newspaper, working on the computer, playing computer games, and doing some fishing and gardening.  The claimant functions at a higher level than her GAF codes suggest.

(Tr. 19-24 (internal citations omitted).)  Based on his RFC assessment, the ALJ opined that

Chadwell was able to perform her past relevant work; consequently, she was not disabled.  (Tr.

24-25.)

E.      Discussion

Chadwell argues that the ALJ erred in finding that Chadwell suffered a mental

impairment that imposed moderate limitations in social functioning, concentration, persistence,

and pace but did not incorporate such limitations into Chadwell's RFC assessment.  (Pl.'s Br. at

4.)  The Commissioner, on the other hand, claims that the ALJ did not err because substantial

evidence supports the ALJ's RFC assessment.   (Def.'s Br. at 10-11.)   Specifically, the

15

Commissioner states the ALJ relied on the medical evidence of record as well as the testimony given at the April 9, 2008 hearing in determining the RFC assessment and such evidence supports such assessment. (Def.'s Br. at 11-12.) The Commissioner states that the "ALJ provided no compensation in the RFC for Chadwell's social functioning limitations because none was required." (Def.'s Br. at 12.)

In evaluating mental disorders under the Listing, the ALJ first considers whether a claimant has a medically determinable mental impairment. *See* 20 C.F.R. Pt 4, Subpt. P, App. 1 § 12.00. To do so, the ALJ must specify the symptoms, signs, and laboratory findings that substantiate the presence of each impairment. 20 C.F.R. § 404.1520a(b)(1); *Boyd v. Apfel*, 239 F.3d 698, 705 (5th Cir. 2001). The regulations require the ALJ to evaluate the degree of functional loss resulting from the claimant's mental impairments. 20 C.F.R. § 404.1520a. If an impairment is found, the ALJ must evaluate the claimant's limitations in four functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3).

After the ALJ rates the degree of functional limitation resulting from any mental impairment, the ALJ determines the severity of such impairment. 20 C.F.R. § 404.1520a(d). If the degree of functional loss falls below a specified level in each of the four areas, the ALJ must find the impairment is not severe at Step Two of the sequential evaluation process, which generally concludes the analysis and terminates the proceedings. 20 C.F.R. § 404.1520a(d)(1). If the ALJ finds that the mental impairment is severe at Step Two, then the ALJ must determine if it meets or equals a listed mental disorder under Sections 12.00-12.09 of the Listing. 20 C.F.R. §§ 404.1520a(d)(2). To determine if it meets or is equivalent in severity to a listed mental

disorder, the ALJ must compare the medical findings about the claimant's impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. 20 C.F.R. § 404.1520a(d)(2). If the impairment is severe but does not meet or equal a listed mental impairment, then the ALJ must conduct an RFC assessment. 20 C.F.R. § 404.1520a(d)(3); *see Boyd*, 239 F.3d at 705. The ALJ's written decision must incorporate pertinent findings and conclusions based on the technique and must include a specific finding of the degree of limitation in each of the functional areas described. 20 C.F.R. § 404.1520a(e)(2).

RFC is what an individual can still do despite her limitations.[7] Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. *Id. See Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). A regular and continuing basis is an eight-hour day, five days a week, or an equivalent schedule. *Id.* RFC is not the least an individual can do, but the most. SSR 96-8p at *2. The RFC assessment is a function-by-function assessment, with both exertional and nonexertional factors to be considered and is based upon all of the relevant evidence in the case record, including medical history, medical signs and laboratory findings, the effects of treatment, reports of daily activities, lay evidence, recorded observations, medical source statements, and work evaluations. *Id.* at *3-5. The ALJ will discuss the claimant's ability to perform sustained work activity on a regular and continuing basis, and will resolve any inconsistencies in the evidence. *Id.* at *7. In making an RFC assessment, the ALJ must consider all symptoms, including pain, and the extent

---

[7]The Commissioner's analysis at Steps Four and Five of the disability evaluation process is based on the assessment of the claimant's RFC. *Perez v. Barnhart*, 415 F.3d 457, 461-62 (5th Cir. 2005). The Commissioner assesses the RFC before proceeding from Step Three to Step Four. *Id.*

to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, and must consider limitations and restrictions imposed by all of an individual's impairments, even impairments that are not severe. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996); SSR 96-8p at *5. The ALJ is permitted to draw reasonable inferences from the evidence in making his decision, but the social security rulings also caution that presumptions, speculation, and supposition do not constitute evidence. *See, e.g.*, SSR 86-8, 1986 WL 68636, at *8 (S.S.A. 1986), *superseded by* SSR 91-7c, 1991 WL 231791, at *1 (S.S.A. Aug. 1, 1991) (only to the extent the SSR discusses the former procedures used to determine disability in children).

At Step Two of the sequential evaluation process, the ALJ found that Chadwell's mental impairment of depression was severe but that it did not meet or equal a listed mental disorder in Section 12.04 of the Listing. (Tr. 16-18.) In reaching this conclusion, the ALJ found that Chadwell's mental impairment symptoms had created moderate difficulties in maintaining social functioning and caused moderate deficiencies of concentration, persistence, or pace but that the criteria of paragraph B and C in Listing 12.04 were not satisfied. (Tr. 18.) The ALJ, noting that the "mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing," stated that he had "translated the . . . "B" and "C" criteria findings into work-related functions in the residual functional capacity assessment." (Tr. 18.) The ALJ then found that Chadwell had the RFC to perform sedentary work except that she must be able to change positions to stretch for two to three minutes every thirty to forty-five minutes, could not

work on ropes, ladders, or scaffolds and could perform other postural functions not more than two hours in workday, could not work at heights or with or in close proximity to hazardous machinery, and could not perform work that involves complex instructions. (Tr. 18.)

Chadwell argues that the ALJ erred in his RFC assessment because the finding of a moderate deficiency in social functioning and concentration, persistence, and pace is not related or analogous to a functional limitation in not performing work that involves complex instructions. However, as noted above, the responsibility for determining the RFC falls to the ALJ. *Ripley*, 67 F.3d at 557. In this case, the ALJ determined that Chadwell's moderate limitations in social functioning and concentration, persistence, and pace affected her RFC as a limitation to not performing work that involved complex instructions. In making this determination, the ALJ reviewed the evidence in the record, specifically noting the following: (1) Gominak's notation on March 19, 2008 that Chadwell's chronic depression was better; (2) Moore's testimony at the hearing before the ALJ that Chadwell would have no limitations with detailed or simple work, would be capable of making simple work-related decisions and working with supervisors, co-workers, and the public, and would have no restrictions in terms of the work setting; (3) Larson's statement in May 2005 that Chadwell had no limitations in understanding or remembering instructions and would be able to meet and interact with supervisors, co-workers, and the public and could meet the mental demands of work as long as it did not involve complex instructions; and (4) statements in the April 14, 2008 PAI indicating that Chadwell may be exaggerating her symptoms. (Tr. 19-24.) Based upon this evidence, the ALJ discounted the

contradictory evidence in the record that indicated that Chadwell might be more functionally limited in social functioning, concentration, persistence, and pace.[8] (Tr. 24.)

As to the issue of concentration, persistence, or pace, the Court notes that the ALJ's finding that Chadwell was moderately limited in her ability to maintain concentration, persistence, or pace is not inherently contradictory with an RFC assessment that Chadwell could not perform work that involves complex instructions. Work that is not complex would most likely not require an abundance of concentration, persistence, or pace. Furthermore, the ALJ is not required to incorporate limitations in the RFC that he did not find to be supported in the record. *See Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988). "While the regulations require the ALJ to evaluate[] the limitations imposed by Plaintiff's mental impairments in certain areas and direct the ALJ to proceed to the RFC determination if Plaintiff's impairments are found severe, the regulations do not specifically require the ALJ to find that the limitations found in evaluating the mental impairment must be word-for-word incorporated into . . . the RFC determination." *Patterson v. Astrue*, No. 1:08-CV-109-C, 2009 WL 3110205, at *5 (N.D. Tex. Sept. 29, 2009).

In this case, the record indicates that the ALJ incorporated Chadwell's functional limitations from his mental impairment into the RFC based upon the ALJ's evaluation of the evidence. In his RFC assessment, the ALJ found that Chadwell was limited to work that did not

---

[8]For instance, as to the reports from the Andrews Center, the ALJ noted that they were made by a registered nurse, not a doctor, and basically showed "situational depression relative to the recent illnesses and deaths of the claimant's mother and two aunts and lack of support from her husband, self admittedly worsened by alcohol abuse." (Tr. 24.) As to Horton's PAI report, the ALJ noted that it suggested exaggeration and alcohol dependence. (*Id.*) In addition, the ALJ discounted Chadwell's low GAF scores, finding they were inconsistent with Chadwell's educational achievement and reported activities. (*Id.*)

involve complex instructions and found that this finding was supported by the evidence in the record. The ALJ properly discussed the evidence in the record in making his RFC determination, noted his duty in assessing Chadwell's RFC to provide a detailed assessment by itemizing the functional limitations caused by Chadwell's mental impairment, explained the reasoning for his RFC determination and for giving less weight to certain evidence, and exercised his responsibility as factfinder in weighing the evidence and in choosing to incorporate limitations into his RFC assessment that were most supported by the record. *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). Because there is substantial evidence in the record that supports the ALJ's RFC assessment, the Court concludes that the ALJ did not err by failing to appropriately consider all of the functional limitations imposed by Chadwell's mental impairment. Consequently, the Commissioner's decision should be affirmed.

## II. RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

## III. NOTICE OF RIGHT TO OBJECT TO PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONAND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within fourteen (14) days after the party has been served with a copy of this document. The Court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until June 15, 2010. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate

21

Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

## IV. ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until June 15, 2010 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED May 25, 2010.

_____
JEFFREY L. CURETON
UNITED STATES MAGISTRATE JUDGE